UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, <br><br> Plaintiff, <br><br> v. <br><br> HANOVER R.S. LIMITED PARTNERSHIP, <br><br> Defendant. | Case No._____ <br><br> **COMPLAINT** |

## INTRODUCTION

1.      Without applying for or receiving a federal construction general stormwater discharge permit, Hanover R.S. Limited Partnership ("Hanover" or the "Company") discharged stormwater from its construction project (the "Project") at 1325 Washington St, Weymouth, Massachusetts (the "Site"). Hanover's construction activities resulted in discharges of polluted stormwater into wetlands with a continuous surface water connection to the Plymouth River ("Plymouth River Wetlands"). Discharges occur directly and via municipal catch basins on Washington Street. Stormwater from the Site contains sediments, which pose a threat to water quality, wetlands, and aquatic ecosystems.

2.      Hanover did not apply for or obtain the required federal permit for these stormwater discharges before commencing construction and did not properly control stormwater pollutant discharges as is required by the federal Clean Water Act, 33 U.S.C. §§1251–1387 (the "Clean Water Act" or the "Act").

3.      Hanover's discharges occur in an area designated by the Commonwealth as an environmental justice community because it has the potential to be disproportionately impacted by environmental harms and risks.

4.      The Commonwealth of Massachusetts (the "Commonwealth") brings this civil suit to enforce the requirements of the federal Clean Water Act and is seeking injunctive relief, civil penalties, and other relief the Court deems appropriate to redress the Facility's illegal discharges of pollution.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

6.      On August 15, 2023, the Commonwealth provided notice of Hanover's violations of the Clean Water Act and of its intention to file suit against Hanover (the "Notice Letter") to the Administrator of EPA; the Administrator of EPA Region 1; the Commissioner of the Massachusetts Department of Environmental Protection; and to Hanover, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).

7.      More than sixty days have passed since the Commonwealth served the Notice Letter.

8.      This action is not barred by any prior state or federal enforcement action addressing the violations alleged in this Complaint.

9.      The Commonwealth has an interest in protecting for its residents the integrity of Massachusetts waters and the related health, safety, economic, recreational, aesthetic, and environmental benefits those waters provide. The interests of the Commonwealth have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean

Water Act, as alleged in this Complaint. The requested relief will redress the harms to the Commonwealth caused by Defendant's activities. Hanover's continuing acts and omissions, as alleged in this Complaint, will irreparably harm the Commonwealth, for which harm it has no plain, speedy, or adequate remedy at law.

10.     Venue is proper in the District Court of Massachusetts pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1) because the source of the violations is located within this judicial district.

## PARTIES

11.     Plaintiff is the Commonwealth, appearing by and through the Attorney General.

12.     The Attorney General is the chief law officer of the Commonwealth, with offices at One Ashburton Place, Boston, Massachusetts. She is authorized to bring this action and to seek the requested relief under G.L. c. 12, §§ 3 and 11D.

13.     Hanover R.S. Limited Partnership is a foreign limited partnership organized under the laws of Delaware. Hanover lists its principal office as 1780 S. Post Oak Lane, Houston, Texas, and has an office at One Marina Park, Suite 701, Boston, Massachusetts. Hanover is operating at 1325 Washington St, Weymouth, Massachusetts.

## STATUTORY BACKGROUND

*Federal Clean Water Act Requirements*

14.     The objective of the Clean Water Act is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." Section 301(a) of the Act, 33 U.S.C. § 1251(a).

15.     The Clean Water Act makes the discharge of pollution into waters of the United States unlawful unless the discharge is in compliance with certain statutory requirements, including

the requirement that the discharge be permitted by EPA under the National Pollutant Discharge

Elimination System ("NPDES"). *See* Sections 301(a), 402(a) and 402(p) of the Act, 33 U.S.C.

§§ 1311(a), 1342(a), 1342(p). Polluted stormwater is the leading cause of water quality impairment

in Massachusetts. During every rain or snowmelt event, runoff flows over the land surface, picking

up potential pollutants such as sediment, organic matter, nutrients, metals, and petroleum by-

products. Polluted stormwater runoff can be harmful to plants, animals, and people. Sediments such

as sands, clays, and silts are the most common pollutants in stormwater runoff by volume and

weight. Sediment discharge significantly harms Massachusetts waters and is the primary cause of

river and stream degradation nationwide. Excess sediment destroys aquatic habitats. It smothers

smaller organisms that live on the bottom of rivers, streams, and wetlands and starves the larger

organisms that feed on them. Sediment also causes flooding by filling up areas that absorb rainwater

and by altering riverine flows.

*The Federal Construction General Permit*

16.    To minimize polluted stormwater discharges from construction activities, EPA has

issued a Construction General Permit for Stormwater Discharges from Construction Activities

("the "CGP") under the NPDES program. *See* 77 Fed. Reg. 12286 (Feb. 29, 2012); 82 Fed. Reg.

6534 (Jan. 19, 2017); 84 Fed. Reg. 24503 (May 28, 2019); 87 Fed. Reg. 3522 (Jan. 24, 2022).[1]

17.    An operator of a construction site that will disturb one or more acres of land

(sometimes referred to herein as a "developer") must apply for and begin complying with the CGP

prior to commencing construction activities. The CGP defines "construction activities" to include

---

[1] With exceptions not relevant here, the 2022 version of the CGP contains clarification and updated provisions to the previous versions of the Permit, although the section and page numberings are occasionally different. For ease of reference, this Complaint cites to the 2022 CGP.

"earth-disturbing activities, such as the clearing, grading, and excavation of land, and other construction-related activities … that could lead to the generation of pollutants." Appendix A of the CGP, pg. A-2.

18.     Under the CGP, developers must conduct advanced planning to analyze the potential for erosion, sedimentation, and other pollutant discharges from their projects, and to design, install, and maintain stormwater controls to minimize stormwater pollutant discharge during construction. CGP, Part 2.1.

19.     The advanced planning requirement is designed to ensure that stormwater controls are fully installed and operational *before* initial site clearing, grading, excavating, and other earth-disturbing activities commence. CGP, Part 2.1.3.

20.     As a first step in the advanced planning process, a developer must prepare a stormwater pollution prevention plan ("SWPPP"). The SWPPP must adequately describe, among other things, the factors relevant to selecting stormwater controls; the stormwater controls selected; the maintenance requirements for stormwater controls; and the developer's procedures for training, inspections, and corrective action. CGP, Part 7.

21.     The SWPPP must include a site map, showing, among other things,

  a.     property boundaries, (CGP, Part 7.2.4(a);

  b.     locations where construction activities will occur, including:

   i.     locations where earth-disturbing activities will occur, including any demolition activities;

   ii.     approximate slopes before and after major grading activities;

   iii.     locations where sediment, soil, or other construction materials will be stockpiled;

iv.    any receiving water crossings;

v.    designated points where vehicles will exit onto paved roads;

vi.    locations of structures and other impervious surfaces upon completion of construction; and

vii.    locations of on-site and off-site construction support activity areas covered by this permit.

CGP, Part 7.2.4(b)(i)-(vii);

c.    locations of any receiving waters within the site and all receiving waters within one mile downstream of the site's discharge point(s). Also identify if any of these receiving waters are listed as impaired or are identified as a Tier 2, Tier 2.5, or Tier 3 water, CGP, Part 7.2.4(c);

d.    any areas of Federally listed critical habitat within the action area of the site as defined in Appendix A, CGP, Part 7.2.4(d);

e.    type and extent of pre-construction cover on the site (e.g., vegetative cover, forest, pasture, pavement, structures), CGP, Part 7.2.4(e);

f.    drainage patterns of stormwater and authorized non-stormwater before and after major grading activities, CGP, Part 7.2.4(f);

g.    stormwater and authorized non-stormwater discharge locations, including:

i.    locations where stormwater and/or authorized non-stormwater will be discharged to storm drain inlets, including a notation of whether the inlet conveys stormwater to a sediment basin, sediment trap, or similarly effective control;

6

    ii.    locations where stormwater or authorized non-stormwater will be discharged directly to receiving waters (i.e., not via a storm drain inlet); and

    iii.    locations where turbidity benchmark monitoring will take place to comply with Part 3.3, if applicable to your site CGP, Part 7.2.4(g)( i)-(iii);

h.    locations of all potential pollutant-generating activities identified in Part 7.2.3 g, CGP, Part 7.2.4(h);

i.    designated areas where construction wastes that are covered by the exception in Part 2.3.3(e)(ii) because they are not pollutant-generating will be stored, CGP, Part 7.2.4(i);

j.    locations of stormwater controls, including natural buffer areas and any shared controls utilized to comply with this permit, CGP, Part 7.2.4(j); and

k.    locations where polymers, flocculants, or other treatment chemicals will be used and stored, CGP, Part 7.2.4(k).

22. The SWPPP must include a description of the construction activities, CGP, Part 7.2.3, and a description of stormwater controls. CGP, Part 7.2.6.

23. The CGP sets forth certain factors to be included among those considered by developers in designing their stormwater controls. These include:

a.    the expected amount, frequency, intensity, and duration of precipitation;

7

b.     the nature of stormwater runoff and run-on at the site, including factors such as expected flow from impervious surfaces, slopes, and site drainage features; and

c.     the soil type and range of soil particle sizes expected to be present on the site.

CGP, Part 2.1.1.

24.     Stormwater controls must be designed and installed in accordance with good engineering practices, CGP, Part 2.1.2, and be properly maintained. CGP, Part 2.1.4.

25.     In general, the CGP requires that the following controls should be included in the SWPPP and then implemented by the developer:

a.     direct stormwater to vegetated areas and maximize infiltration and filtering (CGP, Part 2.2.2);

b.     install perimeter sediment controls (CGP, Part 2.2.3);

c.     minimize sediment track-out (CGP, Part 2.2.4);

d.     appropriately manage sediment-laden piles (CGP, Part 2.2.5);

e.     preserve native topsoil unless infeasible (CGP, Part 2.2.8);

f.     minimize soil compaction (CGP, Part 2.2.9);

g.     use erosion controls and velocity dissipation devices to minimize erosion of stormwater conveyance channels and their embankments, outlets, adjacent streambanks, slopes, and downstream waters (CGP, Part 2.2.10);

h.     properly design and maintain impoundments such as sediment basins (Part 2.2.12);

8

      i.      promptly stabilize exposed portions of the site (CGP, Part 2.2.14); and

      j.      establish long-term stabilization measures that will remain in place after construction activities have ceased.

26. After completing the SWPPP, the developer must submit to EPA a "complete and accurate" Notice of Intent ("NOI") to be covered by the CGP. CGP, Part 1.4. It is a prerequisite for submitting an NOI that a SWPPP with the necessary components has already been developed. CGP, Part 1.4.1. According to the CGP, "[d]ischarges are not authorized if your NOI is incomplete or inaccurate…." CGP, pg. 6, n. 8.

27. The CGP specifies that stormwater discharges must be controlled as necessary to meet applicable water quality standards. CGP, Part 3.

28. The permit holder must also conduct regular site inspections to make sure all stormwater controls are installed and working properly, CGP, Part 4.6.1, and timely perform maintenance and corrective actions when they are not. CGP, Part 4.6.7. If a discharge is occurring during the inspection, the operator must identify its location and document its visual quality and characteristics. CGP, Part 4. An inspection report must be prepared within 24 hours of completing the inspection, CGP, Part 4.7.

29. A permit holder must also take corrective action to expeditiously repair or replace stormwater controls when necessary, and to eliminate any excessive stormwater pollution, water quality standard violation, or prohibited discharge, CGP, Part 5. When the problem requires a new or replacement control or significant repair, the work must be complete within seven calendar days of the day of discovery. If it is infeasible to complete this work within the seven-calendar day deadline, the permittee must document why that is, and document a schedule for installing stormwater controls and making them operational as soon as feasible thereafter. CGP, Part 5.2.

30.     A permit holder must properly train staff to ensure appropriate personnel understands the requirements of the CGP and their responsibility with respect to those requirements. CGP, Part 6.

*Citizen Suit Provision of the Federal Clean Water Act*

31.     Section 505(a)(1) of the Act authorizes citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. §§ 1365(a)(1) and (f), 1362(5).

32.     The Commonwealth is a "citizen" within the meaning of Section 505(g) of the Act, because it is a "person" having an interest which is or may be adversely affected by construction stormwater pollution discharges. *See* 33 U.S.C. § 1365(g).

33.     Under Section 505 of the Act, this Court has authority to enjoin Hanover's violations of the Act's prohibition on unauthorized discharges of pollutants and to require the Company to comply with the CGP. The Court also has authority to impose penalties of up to $66,712 per day for each of the company's prior violations. See 33 U.S.C. §§ 1365(a), 1319(d); 40 C.F.R. § 19.4; 88 Fed. Reg. 989 (Jan. 6, 2023).

**STATEMENT OF FACTS**

34.     Hanover specializes in the development and management of multi-family residential properties nationwide. The Company's web site states that it handles development, construction, property management, and asset management and that its projects total nearly 73,138 units across the country and more than $20.0 billion in project capitalization, including $3.3 billion currently under construction.

35.     The Site is located in an area that has been designated by the Commonwealth as an environmental justice community because it has the potential to be disproportionately impacted by environmental harms and risks.

36.     Sometime between October 2021 and April 2022, without having first applied for, obtained, and complied with the CGP, Hanover began to deforest the Site and remove the top layer of soil in preparation for construction, leaving large swaths of unvegetated sediment exposed to precipitation and susceptible to being mobilized and carried off the site in rain events.

37.     In addition to the exposed and mobile sediments, the Site also contains pollutants associated with construction activities, including debris, silt, sand, cement, concrete, oil or petroleum, organic material, or other construction-related materials such as vehicles or wastes.

38.     The northern half of the Site slopes to the north and drains into the Plymouth River Wetlands directly and via catch basins on Washington Street.

39.     During every rain event, runoff from the Site travels over the surface of the Site, picks up sediments and other pollutants, and discharges them to the Plymouth River Wetlands. The following photographs were taken by the Attorney General's Office in the area of Washington Street near the entrance to the Site on July 16, 2023. They show the presence of sediment in stormwater discharged from the Site and the direction of stormwater flow from the Site into the Plymouth River Wetlands and the catch basins on Washington Street. The photographs have been annotated by the Attorney General's Office.



**Picture description**
⭕ Location of catch basins
➡ Direction of stormwater

*From top to bottom*
*(1) Overflow of stormwater to the wetlands*
*(2) Sediment washed out on Washington Street*
*(3) Stormwater getting into a catch basin*

40.     The next figure, below, is a May 2023 aerial image from Google Earth showing the deforested Site and the exposed sediments left by Defendant's construction activities. The image has been annotated by the Attorney General's Office to show the Site, the approximate area of the Site that drains to the Plymouth River Wetlands directly and through catch basins on Washington Street, the direction of stormwater flow from that area, and the approximate locations of the Plymouth River Wetlands and catch basins on Washington Street that drain into them.



LEGEND

- ⬚ Location of the Facility
- ▢ Plymouth River Wetlands
- → Stormwater Direction
- ● Locations of catch basins
- ∿ Plymouth River
- ∿ Hydrologic connection

*Potential Impacts from Pollutants in Hanover Stormwater Discharges*

41.     Sediment pollution is the most significant cause of water quality degradation in rivers and streams in the United States. Excessive sediment discharged to waterways destroys habitat, harms aquatic organisms, and can contribute to flooding.

42.     Sediment settles to the bottom of waterbodies where it disrupts and smothers bottom-feeding organisms. Sediment becomes suspended in water, where it harms and kills fish by clogging their gills, making it harder for them to breathe.

43.     Excessive sedimentation harms the entire food chain by destroying habitat and killing the smaller organisms on which larger ones depend. For example, sediment in the water column increases turbidity, reducing light penetration, decreasing the ability of plant communities to photosynthesize, preventing animals from seeing food, and reducing fish populations.

13

44. Sediment poses particular risks to wetlands, which play an integral role in the ecology and hydrology of the watershed. The combination of shallow water, high levels of nutrients, and high primary productivity is ideal for the growth of organisms that form the base of the food web and feed many species of fish, amphibians, shellfish, and insects.

45. Sediment can harm wetlands by, among other ways, suffocating the native species and allowing noxious and invasive species to come in and dominate the area. Sedimentation can also decrease wetland volume, decrease the duration that wetlands retain water, and change plant community structure. This can severely harm vegetation, soils, and downstream water quality and significantly increase the risk of flooding.

46. Hanover did not timely apply for or obtain CGP coverage for its stormwater discharges and did not timely implement the terms of the CGP, which are set forth at paragraphs 17-30, above.

### FIRST CAUSE OF ACTION
**Unpermitted Discharges of Construction Stormwater:**
**Violations of Section 301(a) of the Federal Clean Water Act, 33 U.S.C. § 1311(a)**

47. The Commonwealth realleges and incorporates by reference the allegations contained in the above paragraphs.

48. Hanover is a "person" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

49. The Plymouth River Wetlands have a continuous surface water connection with the Plymouth River and are "navigable waters" within the meaning of Section 502(7) of the Clean Water Act, 33 U.S.C. § 1362(7).

50. Every day since Hanover commenced construction activities, as that term is defined in the CGP, that the Company has discharged stormwater from the Site into catch basins

14

on Washington Street without a CGP is a separate and distinct violation of Section 301(a) of the

Act, 33 U.S.C. § 1311(a), for each day on which the violation occurred and/or continued. *See also*

Sections 505(a)(1) and (f), 33 U.S.C.§§ 1365(a)(1) and (f).

51.　These violations establish an ongoing pattern of failure to comply with the CGP's

requirements.

## SECOND CAUSE OF ACTION
### Noncompliance with the Federal Construction General Stormwater Permit:
### Violations of Section 301(a) of the Federal Clean Water Act, 33 U.S.C. § 1311(a)

52.　The Commonwealth realleges and incorporates by reference the allegations

contained in the above paragraphs.

53.　Hanover violated the CGP by failing to implement its requirements, as set forth in

paragraphs 17-30, above.

54.　Hanover's violations of each of the requirements set forth in paragraph 53 above

are separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a), for each day

on which the violation occurred and/or continued. *See also* Sections 505(a)(1) and (f), 33 U.S.C.

§§ 1365(a)(1) and (f).

55.　These violations establish an ongoing pattern of violations with the CGP's

requirements.

## RELIEF REQUESTED

WHEREFORE, the Commonwealth respectfully requests that this Court grant the

following relief:

56.　Require Hanover to obtain coverage under and comply with the CGP;

15

57.     Order Hanover to pay civil penalties of up to $66,712 per day for each of its prior violations. *See* 33 U.S.C. §§ 1365(a); 1319(d); 40 C.F.R. §§ 19.4; 88 Fed. Reg. 989 (Jan. 6, 2023);

58.     Order Hanover to take appropriate actions to restore the quality of wetlands and waterways impaired by its unlawful activities;

59.     Award the Commonwealth's cost (including reasonable investigative, attorney witness, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and

60.     Award any such other and further relief as this court may deem appropriate.

Dated:

Respectfully submitted,

COMMONWEALTH OF MASSACHUSETTS

By its attorney,
ANDREA JOY CAMPBELL
ATTORNEY GENERAL

_____

Helen D. Yurchenco, (Bar No.712235)
Assistant Attorney General
Environmental Protection Division
Office of the Attorney General  One
Ashburton Place, 18th Floor  Boston,
Massachusetts 02108
Tel: 617-727-2200
Email: helen.yurchenor@mass.gov

16